IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE et al., <br><br> **Plaintiffs,** <br><br> v. <br><br> GALE NORTON, in her official capacity as Secretary of the Interior et al., <br><br> **Defendants.** | MEMORANDUM DECISION AND ORDER <br><br> Case No. 2:04CV574 DAK |

This matter is before the court on Plaintiffs' challenge to the Utah Bureau of Land Management's February 2005 sale and issuance of sixteen oil and gas leases on Utah public land.  A hearing on this matter was held on March 1, 2006.  At the hearing, Plaintiffs Southern Utah Wilderness Alliance, the Natural Resources Defense Council, and The Wilderness Society (collectively referred to as "SUWA") were represented by Steven H.M. Bloch and Sharon Buccino.  The United States Department of Interior Utah State Office of the Bureau of Land Management (referred to as the "Utah BLM" or "BLM") was represented by Kelly A. Johnson.

Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.  Since taking the appeal under advisement, the court has further considered the law and facts relating to the appeal.  The court has also considered the Utah

BLM's submission of supplemental authority, filed on June 2, 2006, and SUWA's response to

that submission, filed on June 5, 2006.  Now being fully advised, the court renders the following

Memorandum Decision and Order.

## I.  INTRODUCTION

In this action, SUWA challenges the sale and issuance of oil and gas leases for sixteen

parcels of public lands in southern Utah.   In April 2003, the State of Utah and the United States

Department of Interior ("DOI") entered into a controversial settlement agreement, which

allegedly ended the Interior Department's authority to establish new wilderness study areas.

The November 2003 lease sale at issue here was one of the first lease sales to include several

parcels of public lands that, according the BLM's own Wilderness Inventory, are remarkable,

wilderness quality landscapes.  The leases were sold and issued by the Utah BLM, and each

lease specifically authorized surface-disturbing activities on at least part of the leasehold.

According to SUWA, this lease sale sent an unmistakable message to the American public that

oil and gas development had clearly become the agency's "No. 1 priority."

SUWA contends that in issuing the oil and gas leases, the Utah BLM failed to comply

with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4332, *et seq*., and the

National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470, *et seq.*  Specifically, SUWA

argues that the Utah BLM violated federal law in three independent ways.

First, it claims, the Utah BLM violated NEPA by issuing four leases in the area

administered by the Richfield field office without taking a hard look at the no-leasing alternative.

It contends that the Richfield field office, which oversees the Flat Tops area, is guided by

environmental analyses and land use plans that are over thirty years old and that due to their age

and antiquity, did not take a hard look at the no-leasing alternative in the Federal Land Policy

and Management Act's ("FLPMA") land use planning context, in violation of NEPA.

Second, SUWA asserts that the Utah BLM violated NEPA by failing to consider

significant new information about wilderness values and characteristics of all sixteen parcels.

According to SUWA, this significant new information only became available in the late 1990's,

and thus post-dated the Utah BLM's NEPA analyses and land use plans by several years to

several decades.

Finally, SUWA contends that the Utah BLM violated the NHPA by failing to consult

with the Utah State Historic Preservation Officer ("SHPO") about the effects of the leasing.

Because of these alleged violations of federal law, SUWA seeks recision of the sixteen oil and

gas leases at issue in this case.

## II.  BACKGROUND

### A.        BLM OIL AND GAS LEASING PROCEDURES

"The DOI manages the use of federal oil and gas resources through a three-phase decision-

making process.  At the earliest and broadest level of decision-making, the DOI develops land

use plans – often referred to as resource management plans (RMPs).  'Generally a land use plan

describes, for a particular area, allowable uses, goals for future condition of the land, and

specific next steps.'"  *Pennaco Energy, Inc. v. U.S. Dep't of the Interior* ("*Pennaco*"), 377 F.3d

1147, 1151 (10th Cir. 2004) (internal citation omitted).  "[T]he approval of an RMP is considered

a major federal action significantly affecting the quality of the human environment, (*see* 43

C.F.R. § 1601.0-6), and an [environmental impact statement] is prepared as a step in the process of preparing the RMP."[1]   *Southern Utah Wilderness Alliance*, 164 IBLA 118, 124 (2004).   In its land use plans, the BLM classifies lands in a particular management area in one of four ways: (1) available for leasing with standard stipulations; (2) available for leasing with special stipulations; (3) available for leasing with no-surface occupancy stipulations; or (4) closed to leasing.  These leasing classifications are made as part of the BLM's land use planning and resource allocation decisions and are made in conjunction with a NEPA analysis.

Each BLM state office is required to conduct a competitive oil and gas lease sale at least four times a year if public lands are available for leasing and BLM receives nominations for leasing.  43 C.F.R. § 3120.1-2.  Interested members of the public and industry nominate parcels for competitive lease by sending letters of interest to a particular BLM state office that identify specific tracts of land that are desired for lease.  *Id.* § 3120.3.   Prior to conducting a quarterly lease sale, the Utah BLM state office prepares a preliminary list of oil and gas lease parcels that may be offered at that sale.

Individual BLM field offices then prepare Determinations of NEPA Adequacy ("DNAs") for parcels within their respective jurisdictions to "determine whether [BLM] can properly rely on existing NEPA documents;" that is, "whether the issuance of a particular oil and gas lease is consistent with the [governing] RMP" and its accompanying environmental impact statement

---

[1]      Some Utah BLM field offices are managed in whole or in part by management framework plans ("MFPs"), the predecessor documents to RMPs.  *See* 43 C.F.R. § 1610.8; *Southern Utah Wilderness Alliance*, 164 IBLA at 124.  BLM did not prepare EISs or other National Environmental Policy Act documents as part of the MFP approval process.  *Id.*

("EIS").  *Pennaco*, 377 F.3d at 1151, 1162.  DNAs are an administrative convenience created by

the BLM, and are not defined in NEPA or its implementing regulations issued by the Council of

Environmental Quality.  *See id.* at 1162.

When the DNA form is completed, the BLM field offices either recommend that

proposed parcels be offered "as is," that they be offered with slightly modified legal descriptions

or additional lease sale notices if appropriate, or that certain parcels not be offered for lease until

additional NEPA documentation is prepared.  Once the BLM field offices complete their DNAs

and return them to the state office, a final sale list is prepared and the public is notified that a

competitive lease sale will take place no less than 45 days after the date of posting.  43 C.F.R. §

3120.4-2.  The Utah BLM generally provides a 45 day protest period where any member of the

public may "protest" the inclusion of certain parcels in a particular lease sale.   43 C.F.R. §§ 4.21

and 3120.1-3.  *See* Administrative Record ("AR") 0236; Notice of Competitive Lease Sale,

September 25, 2003.

The lease sale itself is a public auction with leases sold to the highest bidder.  43 C.F.R. §

3120.5.   If not acquired on the day of the sale, leases remain available for purchase at a reduced

rate over the next two years.   *Id.* § 3120.6.  Competitive and non-competitive leases have

primary terms of 10 years and can be held indefinitely by production of hydrocarbons in paying

quantities.  *Id.* §§ 3110.3-1 and 3120.2.  BLM completes the leasing transaction by "issuing" the

lease to the high bidder after the lease sale.  *Id.* § 3120.5-3.  If a lease is protested by a member

of the public, the lease is not issued until the protest is resolved.

A lessee has certain, defined surface use rights:  "A lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove, and dispose of all the leased resource in a leasehold . . ."  *Id.* § 3101.1-2.  In sum, "in the fluid minerals program, [the point of irretrievable and irreversible] commitment occurs at the point of lease issuance."  *Pennaco*, 377 F.3d at 1260 (quoting *BLM Handbook for Planning for Fluid Mineral Resources*).

**B.     UTAH BLM'S WILDERNESS QUALITY LANDS**

Congress passed the Wilderness Act of 1964, 16 U.S.C. §§ 1131-36 to "secure for the American people of present and future generations the benefit of an enduring resource of wilderness."  16 U.S.C. § 1131(a).  In 1976, Congress passed the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-84, which among many other things, made the varying landscapes managed by the Bureau of Land Management eligible for wilderness designation.  43 U.S.C. § 1782.

To facilitate Congress's evaluation and eventual designation of wilderness on BLM lands, FLPMA directed the agency to inventory and identify all of the lands under its management that remained eligible for wilderness protection.  *Id.*  In Utah, the BLM began this process in the late 1970's and completed both its initial and intensive inventories by 1980.  *See generally, State of Utah v. Babbitt*, 137 F.3d 1193, 1198-99 (10th Cir. 1998).  In 1982, the agency concluded that only 3.2 million of the nearly 24 million acres of BLM lands in Utah qualified as wilderness and designated them as wilderness study areas ("WSAs").  *See id.* (describing history of Utah wilderness debate).  Importantly, the BLM's land use plans and accompanying NEPA

analyses that were prepared after the 1978-80 wilderness inventory – including the plans at issue in this case[2] – did not reanalyze the wilderness characteristics of lands that were passed over for wilderness study area status.  Rather, the plans and NEPA analyses adopted the conclusion that lands not identified as WSAs did not contain wilderness characteristics (or their constituent elements, such as naturalness, outstanding opportunities for solitude or primitive and unconfined recreation).

In 1991, President George H.W. Bush recommended to Congress that only 1.9 million acres of Utah BLM wilderness study areas receive formal protection under the Wilderness Act. *Babbitt*, 137 F.3d at 1198-99.  Congress did not act on this recommendation.  *See id.*  In 1996, the Department of Interior instructed BLM to re-inventory that part of the 5.7 million acres of BLM lands that had not been designated as wilderness study areas but were identified in the then-current version of the proposed America's Redrock Wilderness Act.  *See id.* at 1197-1200.  In 1999, BLM published its finding and concluded that the agency's earlier inventory had overlooked 2.6 million acres of lands in Utah that possessed wilderness character.  *See* AR 0127-0129; U.S. Dep't of the Interior, Utah Wilderness Inventory ("Wilderness Inventory") (1999) at vii-ix, xiv-xv.

---

[2]     This case focuses on three Utah BLM field offices – Moab, Vernal, and Richfield.  The Moab field office is managed pursuant to the 1985 Grand RMP/EIS and 1988 Oil and Gas Supplemental environmental assessment ("EA").  The Vernal field office is managed pursuant to the 1994 Diamond Mountain RMP/EIS, the 1985 Book Cliffs RMP/EIS, and the 1988 and 1989 Oil and Gas Supplemental EAs.  The Richfield field office is managed pursuant to the 1975 Price Environmental Analysis Record, the 1982 Henry Mountain Management Framework Plan, and the 1988 Sevier and Henry Mountain Oil and Gas Supplemental EA.

As the BLM's Wilderness Inventory explained,

> [t]he Secretary's instructions to the BLM were to *"focus on the conditions on the disputed ground today*, and to obtain the most professional, objective, and accurate report possible so we can put the inventory questions to rest and move on." [The Secretary] asked the BLM to assemble a team of experienced, career professionals and directed them to apply the same legal criteria used in the earlier inventory and the same definition of wilderness contained in the 1964 Wilderness Act.

AR 0127; *Id.* at vii (emphasis added).  The BLM compiled comprehensive case files to support its findings that the 2.6 million acres of Utah BLM lands had wilderness characteristics, including numerous aerial and on-the-ground photographs, as well as detailed narratives with accompanying source materials.  *See*, *e.g.*, AR 0043-0068; Desolation Canyon wilderness inventory evaluation (summarizing Desolation Canyon permanent wilderness inventory area case file).  These inventoried wilderness quality lands have come to be known as wilderness inventory areas ("WIAs").  This 2.6 million acre inventory identified over 100 WIAs, including the following four areas:  Desolation Canyon, Floy Canyon, Coal Canyon, and Flume Canyon WIAs.[3]  Twelve of the sixteen parcels at issue in this case are located in these four WIAs.

Following a controversial settlement agreement between the State of Utah and the Interior Department in April 2003 which allegedly did away with the Interior Department's authority to establish new wilderness study areas (i.e., to fully consider the WIAs and designate some or all as WSAs), this lease sale marked one of the first times that BLM proposed to sell oil and gas leases in areas that BLM acknowledged had wilderness character.  See AR 2403; Brent

---

[3]   These four areas have been proposed for wilderness protection in America's Redrock Wilderness Act (H.R. 1774/ S. 882).

Israelsen, *Oil, gas leases up for bid in wilds*, THE SALT LAKE TRIBUNE (Oct. 31, 2003); AR

4533; Robert Gerhke, *Federal Gov't to Action Off Oil Leases*, ASSOCIATED PRESS (Oct. 30,

2003).[4]  *See generally State of Utah v. Norton*, 2:96CV00870 (Stipulation and Joint Motion to

Enter Order Approving Settlement and to Dismiss the Third Amended and Supplemented

Complaint), 12-15 (D. Utah April 11, 2003); *State of Utah v. Norton*, 2:96CV00870 (Order

Approving Settlement and to Dismiss the Third Amended and Supplemented Complaint) (D.

Utah April 14, 2003); Joe Baird, *Judge says 'No More Wilderness' May Get Reviewed*,  THE

SALT LAKE TRIBUNE (July 29, 2006).

### 1.  Desolation Canyon Wilderness Inventory Area

Lease parcels UT 026, UT 027, and UT 028 are located in northeastern Utah in the area

designated by BLM as the Desolation Canyon WIA.  Parcels UT 026 and UT 028 straddle the

Desolation Canyon section of the Green River and parcel UT 027 is located just west of the

river.  *See* AR 0041; Map – Vernal Area Lease Parcels.   The BLM's "wilderness inventory

evaluation" of the Desolation Canyon WIA (unit 1) explained that the area has "natural, scenic,

rugged terrain" and contains "outstanding opportunities for solitude and primitive and

unconfined recreation [which] makes this area stand alone.  Unit 1 is an extension of the

Desolation Canyon WSA [wilderness study area] to the south and greatly enhances the

wilderness values found in the WSA."  AR 0045; Wilderness Inventory Evaluation, Desolation

Canyon Units 1-9, at 3 (1998).   BLM's Wilderness Inventory further stated that the Desolation

---

[4]      *See also, The End of Wilderness*, THE NEW YORK TIMES (May 4, 2003);Timothy Egan,
*Bah, Wilderness! Reopening a Frontier to Development*, THE NEW YORK TIMES (May 4, 2003).

Canyon wilderness inventory area "[i]n combination with the [Desolation Canyon wilderness study area], represents one of the largest blocks of roadless BLM lands within the continental United States." AR 0030; Utah Wilderness Inventory, at 127. The Desolation Canyon WIA, "together with the Desolation Canyon WSA, comprise[s] a large, remote area where a visitor is truly isolated from the outside world. The vast size, configuration, numerous scenic vistas, diversity of vegetation, and rugged topography provide the visitor with numerous places and opportunities to become isolated from others." *Id.* The BLM's 1998 wilderness inventory concluded for the first time that the lands making up the Desolation Canyon wilderness inventory area have wilderness character.

### 2. Book Cliffs - Floy, Flume, and Coal Canyon Wilderness Inventory Areas

Parcels UT 029, UT 030, UT 031, UT 034, UT 036, UT 037, UT 038, UT 039, and UT 053 are located in three areas on the southern flank of Utah's Book Cliffs that the BLM has designated as the Floy, Flume, and Coal Canyon WIAs. *See* AR 0081; Map – Moab Area Lease Parcels. The BLM's wilderness inventory evaluation for the Flume Canyon WIA explained that "[t]he Flume Canyon inventory area is one of seven contiguous inventory areas [including the Coal and Floy Canyon WIAs] across much of the Roan Cliffs and Book Cliffs, the longest continuous escarpment in the world." AR 0083; Flume Canyon wilderness inventory evaluation, at 1 (1998). BLM's 1998 wilderness inventory evaluation described the Floy Canyon WIA as follows:

> Opportunities for solitude and primitive recreation are outstanding throughout
> the inventory area. Topographic and vegetative screening provide many places
> to be alone. The inventory area contains long and deep canyons, unusual

geologic features, visual diversity, and a variety of wildlife species.  Wilderness
values are enhanced by the contiguous Desolation Canyon and Floy Canyon
Wilderness Study Areas (WSAs).

AR 0092; Floy Canyon wilderness inventory evaluation, at 1 (1998).  BLM similarly described

the Coal Canyon WIA as retaining "a natural condition with little or no evidence of the presence

of man.  Opportunities for solitude and primitive recreation are outstanding.  The inventory area

contains panoramic vistas, many long and deep canyons, perennial streams, and a broad variety

of wildlife species."  AR 0101; Coal Canyon wilderness inventory evaluation, at 1 (1998).

    The BLM's 1998 Wilderness Inventory concluded, for the first time, that the lands

comprising the Floy Canyon, Flume Canyon and Coal Canyon wilderness inventory areas have

wilderness character.

### 3.  Flat Tops Proposed Wilderness Area[5]

    The BLM also received new information from SUWA and others in 2002 about the

wilderness and other special values of four additional lease parcels – UT 008, UT 009, UT 011,

and UT 012 – located in the remote Flat Tops proposed wilderness area.  *See* AR 3244-3279;

Southern Utah Wilderness Alliance Supplemental and New Information re: Utah Wilderness

Coalition's Flat Tops Proposed Wilderness Unit.  *See also* AR 0111; Map – Hanksville Area

Lease Parcels.  These four parcels are located on lands in south-central Utah and are emblematic

of the area's wild and remote redrock and desert landscape.  In 2002, BLM reviewed SUWA's

significant new information and determined that parcels UT 008, UT 009, UT 011, and UT 012

---

[5]    The Flat Tops proposed wilderness unit is included in American's Redrock Wilderness
Act and passage of the Act would designate that area as Wilderness.

have a "reasonable probability" that they "may contain" wilderness characteristics.  AR 4988-4994; Evaluation of New Information Suggesting that an Area of Public Lands Has Wilderness Characteristics (concluding that "the information SUWA provides is new and significantly different from that considered in the BLM's previous inventory. . . .  BLM staff review concurs that the unit is sufficiently large and varied to potentially provide outstanding opportunities for solitude.")

**C.      UTAH  BLM'S NOVEMBER 2003 COMPETITIVE OIL AND GAS LEASE SALE**

In the summer of 2003, the Utah BLM published a preliminary sale list for the quarterly competitive oil and gas lease sale to be held on November 24, 2003.  AR 0431-0491. Utah BLM field offices prepared and completed DNAs in August and September of 2003. *See generally*, AR Volume 2.  On September 25, the BLM notified the public that the agency intended to offer a total of 55 parcels at its November 24, 2003 oil and gas competitive lease sale.  AR 0227-0231. The Utah BLM notified Native American Tribes about the lease sale, but neither notified nor consulted with the Utah State Historic Preservation Officer ("Utah SHPO") regarding the sale or its impacts to cultural resources.  *See* BLM Answer to Amended Complaint, ¶¶ 49-54.  On October 2, 2003, the BLM issued a finding of no significant impact ("FONSI") regarding the November 24 sale.  AR 0225.

On November 10, 2003, Southern Utah Wilderness Alliance, The Wilderness Society, Natural Resources Defense Council, and others protested the inclusion of 21 parcels in the November 24 lease sale.  AR 0003-0127; SUWA Protest.  Of these 21 protested parcels, the following 16 parcels were sold either competitively on November 24 or at the "day-after" non-

12

competitive sale on November 25, 2003: UT 008, UT 009, UT 011, UT 012, UT 026, UT 027,

UT 028, UT 029, UT 030, UT 031, UT 034, UT 036, UT 037, UT 038, UT 039, and UT 053.

AR 0193-0198; Competitive and Non-Competitive Lease Sale Results.  All of the 16 protested

and sold lease parcels include lands proposed for wilderness designation in America's Redrock

Wilderness Act and all authorized some level of surface disturbance (i.e, sold without no surface

occupancy stipulations).  AR 0172-0175.  SUWA alleged in its Protest of the November 24 lease

sale that the BLM's decision to lease the 16 parcels violated NEPA, the NHPA, and other federal

laws and their implementing regulations.  AR 0003-0024.

The BLM denied SUWA's protest in its entirety on January 7, 2005, and completed the

leasing transaction and issued the 16 leases at issue in this case in February 2005.  AR 4702-

4720; Protest Decision.

### III.   STANDARD OF REVIEW

Pursuant to the Administrative Procedures Act (the "APA"), this court must review

BLM's actions to determine solely whether the action was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A).[6]  *See Marsh v. Oregon*

*Natural Resources Council*,  490 U.S. 360 (1989).  This standard is narrow and "[t]he court is

not empowered to substitute its judgment for that of the agency."  *Citizens to Preserve Overton*

*Park v. Volpe*, 401 U.S. 402, 416 (1971); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560,

---

[6]  Under *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir.1994), the court treats this matter as an appeal of an agency decision.

1573 (10th Cir. 1994).  While the reviewing court must undertake a "thorough, probing, in-depth review," it is empowered to determine only whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* at 415-16; *see also Marsh*, 490 U.S. at 378.  "In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record." *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1575 (10th Cir.1994); *see also Pennaco ,* 377 F.3d at 1156.

Plaintiffs have the burden of showing, pursuant to the standards set forth in the APA, that BLM acted in a manner that violates an underlying substantive statute, such as NEPA.  *See San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986).  Moreover, BLM is entitled to deference on technical issues within its area of expertise.  *See Morongo Band of Mission Indians v. Federal Aviation Admin.*, 161 F.3d 569, 576 (9th Cir. 1998).  An agency decision is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs contrary to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999) (same).

14

# IV.  DISCUSSION

As stated above, SUWA contends that the Utah BLM has violated federal law in three independent ways.  To the contrary, the Utah BLM urges the court to uphold its decision to sell the leases at issue.  It argues that it has not violated either NEPA or the NHPA.  Specifically, the Utah BLM claims that its analysis supporting the leases on the four parcels in the Richfield field office was adequate for the purposes of NEPA.  It also argues that it was not required to supplement the environmental analysis to support the leasing decisions.  It emphasizes that the question of whether information rises to the level of requiring additional analysis "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh*, 490 U.S. at 376.  Therefore, "[c]ourts must uphold an agency determination that [supplemental review] is not required if that determination is not arbitrary and capricious." *Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417, 1422 (9th Cir. 1989), *rev'd on other grounds*, 980 F.2d 1330 (9th Cir. 1992).

The Utah BLM contends that, through the DNA process, it carefully reviewed the existing environmental analysis and concluded that the NEPA documentation fully analyzed the values now labeled "wilderness characteristics" such as scenery, wildlife, and the absence of human activity.  AR at 565 (Moab), 651 (Richfield) and 705 (Vernal).  It argues that the BLM reasonably determined that the information contained in BLM's 1999 Re-inventory did not rise to the level of significant new information requiring a new EA or EIS.  AR at 4704.  Utah BLM found that the any new information did not show that oil and gas leasing would impact the parcels in a significant manner or to a significant degree not already considered in the relevant

NEPA documents.  *Id.*  In addition, it claims that the uses of the lands have not significantly

changed since the preparation of the land use  planning documents and the anticipated oil and

gas development scenario has not changed significantly from that analyzed in the environmental

documents.  *Id.*

Finally, the Utah BLM argues that it Complied with the National Historic Preservation

Act.  Although it denies any violations of federal law, it contends that, if the court decides

otherwise, the appropriate remedy is remand–not recision of the lease, as SUWA requests.  *See*

*Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 549 (1978); *Camp,* 411 U.S. at

143.

### A.    THE NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, is the

"basic national charter for protection of the environment."  40 C.F.R. § 1500.1.  "NEPA

'prescribes the necessary process' by which federal agencies must 'take a "hard look" at the

environmental consequences' of the proposed courses of action."  *Pennaco*, 377 F.3d at 1150

(quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1162-63 (10th Cir.

2002)) (internal citation omitted).  "[T]he statute does not impose substantive limits on agency

conduct." *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1213 (10th Cir.1997) (citing

*Robertson v. Methow Valley Citizens' Council,* 490 U.S. 332, 350, (1989)). "Rather, once

environmental concerns are 'adequately identified and evaluated' by the agency, NEPA places

no further constraint on agency actions." *Id.* (quoting *Robertson,* 490 U.S. at 350).  The

fundamental objective of NEPA is to ensure that an "agency will not act on incomplete

information only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1990) (citation omitted).

NEPA requires all federal agencies to prepare an "environmental impact statement" ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).  The Council on Environmental Quality, an agency within the Executive Office of the President, has promulgated regulations implementing NEPA. Pursuant to those regulations, to determine whether an EIS is required, federal agencies may first prepare an environmental assessment ("EA").  *See* 40 C.F.R. § 1501.4.  An EA must consider several factors to determine if an action will significantly affect the environment, thus requiring the preparation of an EIS.  After considering the "significance" and other relevant factors in an EA, if an agency decides not to prepare an EIS, it must issue a FONSI to justify its decision not to prepare an EIS.  40 C.F.R. § 1508.13.  The FONSI must provide a convincing statement of reasons why the action "will not have a significant effect on the human environment."  *Id.* "'DNAs, unlike EAs and FONSIs, are not mentioned in [] NEPA or in the regulations implementing [] NEPA'. . . .  Thus, DNAs are not themselves documents that may be tiered to NEPA documents, *but are used to determine the sufficiency of previously issued NEPA documents*." *Southern Utah Wilderness Alliance*, 164 IBLA at 123 (quoting *Pennaco*, 377 F.3d at 1162).

NEPA further requires that federal agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternate uses of available resources," 42 U.S.C. § 4332(E), and,

17

accordingly, the EA must include a discussion of these mandated alternatives. *See* 40 C.F.R. §
1508.9. "In order to provide a 'clear basis for choice among options by the decisionmaker and
the public,' an agency's EIS must consider the 'no-action' alternative." *Pennaco*, 377 F.3d at
1150 (quoting 40 C.F.R. § 1502.14).

In this case, the court finds that the Utah BLM violated NEPA in two independent ways:
(1) it sold four leases in the Richfield field office without first preparing an adequate pre-leasing
document and (2) it sold the challenged leases after arbitrarily determining that it did not need to
supplement existing NEPA analyses in light of the agency's own Wilderness Inventory and
subsequent new information provided by Southern Utah Wilderness Alliance.

  1.  **The Utah BLM Failed to Prepare an Adequate Pre-Leasing NEPA
Document to Support the Sale of Lease Parcels UT 008, UT009, UT011,
and UT012.**

In *Southern Utah Wilderness Alliance*, 164 IBLA 118 (2004), the Interior Board of Land
Appeals (the "IBLA") overturned a BLM decision to sell seven oil and gas leases in two field
offices that were managed pursuant to Management Framework Plans ("MFPs").[7]   The IBLA
held that BLM had failed to prepare an adequate pre-leasing document (EIS or EA) that analyzed
the no-lease alternative to support the sale, and thus violated NEPA. *Id.* at 120-24.   The IBLA
discussed the important distinctions between management framework plans and resource
management plans ("RMPs"):

---

[7]  The BLM did not seek reconsideration of this decision, and it therefore represents the
final decision for the Department of the Interior.  43 C.F.R. § 4.1.

> BLM's regulations make it clear that with respect to NEPA compliance, the environmental documents prepared in connection with RMPs and MFPs are not functional equivalents. Unlike the approval of an MFP, the approval of an RMP is considered a major federal action significantly affecting the quality of the human environment, (*see* 43 C.F.R. § 1601.0-6), and an EIS is prepared as a step in the process of preparing the RMP. *In this case, the approval of the MFPs was not deemed a major federal action significantly affecting the quality of the human environment and did not result in the preparation of an EIS that would qualify as a "pre-leasing" EIS.*

164 IBLA at 124 (emphasis added).

In that case, like here, the BLM relied on DNAs to assess whether "existing EAs and EISs were adequate to support the proposed leasing of the parcels" and whether the leasing of the parcels "would conform to existing land use plans." *Id.* at 122. There, the BLM argued that NEPA analyses pre-dating FLPMA known as environmental analysis records or "EARs," as well as MFPs, subsequent oil and gas supplemental environmental assessments, and the lease sale DNAs, together, contained sufficient pre-leasing NEPA analysis to support the lease sale. *Id.* at 123.[8] The IBLA reviewed the documents relied upon by BLM to support its leasing decision and concluded that the agency had violated NEPA because it failed to consider the no-action alternative (no leasing) in the land use planning context prior to the lease sale. *Id.* at 123-24.

Federal courts have arrived at the same conclusion in other cases that agencies violated NEPA by issuing oil and gas leases without considering the no-action alternative. *See Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228-30 (9th Cir. 1988) (BLM and Forest Service

---

[8]    EARs are NEPA documents tiered to management framework plans, as opposed to an earlier NEPA analysis (such as an RMP/EIS). *See Southern Utah Wilderness Alliance*, 164 IBLA at 124 (approval of MFPs not considered major federal action and "did not result in preparation of an EIS that would qualify as a 'pre-leasing' EIS.").

violated NEPA by failing to consider no-action (no leasing) alternative); *Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1145-46 (D. Mont. 2004) (BLM violated NEPA by failing to consider no-action alternative).

The holding in *Southern Utah Wilderness Alliance* makes clear that the Utah BLM's decision in this case to lease the four Richfield field office parcels violated NEPA.  The Richfield field office DNA and BLM's Protest Decision primarily rely on the 1975 Price Environmental Analysis Record ("Price EAR"), a document that was not prepared in conjunction with any land use plan, for support of the agency's decision to lease.  *See* AR 2679-2927; Price EAR.  Indeed, the Price EAR and its alternatives analysis, as well as its leasing category decisions were not made contemporaneously with land use planning decisions, but rather were tiered to MFPs prepared between 1968 to 1974.  *See* AR 2683-84 (listing MFPs).

Moreover, the Henry Mountain Management Framework Plan ("Henry Mountain MFP"), the land use plan governing management for the areas of the Richfield field office at issue in this case, was finalized seven years after the Price EAR, in 1982.  Because BLM did not consider preparation of the Henry Mountain MFP a "major federal action," that document was not accompanied by an EIS or EA.  *See* AR 2983.  In preparing the Henry Mountain MFP BLM did not conduct a separate alternatives analysis or meaningfully consider the no-leasing alternative.[9]

---

[9]  The BLM contends that SUWA's argument that the Price EAR failed to consider a no-leasing alternative is factually incorrect.  See Opposition Brief at 8 n.4.  The court applies a "rule of reason" analysis to determine whether the range of alternatives the BLM considered and the extent to which it discuss[ed] them," was adequate.  *Utahns for Better Trans. v. Department of Transp.*, 305 F.3d 1152, 1166-67 (10th Cir. 2002) (citation omitted); *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002).  Neither the Price nor Richfield EAR gave the necessary "full and meaningful consideration" to the no-leasing alternative–or any other alternatives to the proposed action–as required by NEPA.

Rather, BLM adopted the leasing decisions made in the earlier Price EAR: "the Henry Mountain MFP allowed for leasing decisions consistent with the environmental analysis" found in the 1975 Price EAR.  AR 04956; Richfield field office DNA, at 3.

In 1988, the Utah BLM prepared the Sevier River and Henry Mountain Supplemental Oil and Gas Leasing EA ("Supplemental EA"), which tiered to, among other documents, the Price EAR.  AR 2992-3039.  *See* AR 4956, Richfield field office DNA, at 3 (explaining that "[b]y oversight the 1975 [Price EAR] was not cited in the 1988 [Supplemental] EA).  Like the Henry Mountain MFP, the Supplemental EA relied on the earlier alternatives analysis from the Price EAR that failed to consider the no-action alternative in the context of land use planning.  *See* AR 3000-3001.[10]

In sum, BLM's decision to sell and issue the following four Richfield field office leases – UT 008, UT 009, UT 011, and UT 012 – was not supported by an adequate pre-leasing NEPA analysis (EA or EIS).  This failure, like BLM's failure in *Southern Utah Wilderness Alliance* to consider the no-lease alternative in the context of land use planning decisions, is fatal to the agency's leasing decision.  Accordingly, BLM's decision to lease these parcels was contrary to NEPA and must be set aside.

_____

[10]      In 1984, the Utah BLM prepared the Utah Combined Hydrocarbon Leasing Regional EIS, which dealt with new tar sands leasing and converting existing leases to combined hydrocarbon leases.  This EIS, however, did not change the earlier analysis of alternatives found in the Price EAR.  AR 2984.

**2**.   **As to All 16 Leases at Issue, the Utah BLM Violated NEPA's Supplemental Analysis Requirement**

An agency's NEPA duties do not end when it completes its initial environmental analysis and approves a federal project.  As the Supreme Court has explained, "[i]t would be incongruous with . . .  the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." *Marsh*, 490 U.S. at 371.  Thus,

> [i]f there remains "major federal action" to occur, and if . . . new information is sufficient to show that the remaining action will "affect[t] the quality of the human environment" . . . to a significant extent not already considered, a supplemental EIS must be prepared.

*Id.* at 374; *see also* 40 C.F.R. § 1502.9(c) (regulations mandating supplementation); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (agencies must "be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of [its] planned action.'") (*quoting Marsh*, 490 U.S. at 374).  NEPA's duty to supplement applies equally to environmental impact statements and environmental assessments.  *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998).

In this case, the Utah BLM authorized this lease sale, not on the basis of a newly drafted EA or EIS that might have considered the latest information before the agency, but rather pursuant to "Determinations of NEPA Adequacy" ("DNAs") which purported to determine that "previously issued NEPA documents" sufficiently addressed the specific wilderness character

22

information contained in BLM's own recent Wilderness Inventory Report and comprehensive

wilderness case files.  AR 0070-0079; BLM Instruction Memorandum No. 2001-062 (DNA's are

an internal review process which assists BLM in determining "whether [it] can rely on existing

NEPA documents for a current proposed action").  In short, the DNAs prepared to allegedly

support this sale are not new NEPA analyses, and the underpinnings of the Utah BLM's decision

here not to supplement its outdated EISs and EAs must rise or fall on the contents of the

previously issued NEPA documents.

The court finds that the Utah BLM ignored significant new information when it decided

to lease the sixteen parcels at issue without first conducting a supplemental NEPA analysis.

The Utah BLM's own files – as well as information provided by the Southern Utah Wilderness

Alliance – presented a textbook example of significant new information about the affected

environment (the wilderness attributes and characteristics of the Desolation Canyon, Floy

Canyon, Flume Canyon, Coal Canyon, and Flat Tops unit) that would be impacted by oil and gas

development; information that was not reflected in BLM's existing NEPA analyses.  The BLM's

Wilderness Inventory and SUWA's Flat Tops wilderness proposal postdate by several years (in

some cases by decades) its land use plans and NEPA analyses that govern the lands at issue here.

The Utah BLM did not revise its NEPA analyses to reflect this significant new information

before selling the leases at issue here.

### a.     Moab field office - Floy, Flume, and Coal Canyon WIAs

The nine parcels located in the Floy, Flume, and Coal Canyon WIAs are located on lands

managed by BLM's Moab field office, and that office's management is guided by the 1985

23

Grand RMP/EIS and a 1988 oil and gas leasing environmental assessment ("1988 Oil and Gas EA").  AR 4875; Moab field office DNA, at unnumbered 2.  When those documents were prepared, BLM did not know that the lands in question had wilderness characteristics because its prior inventory (conducted between 1978-80) had concluded that they did not.  AR 4704 n.1; Protest Decision, at 3 n.1.  Thus, it is not surprising that a detailed review of the Grand RMP/EIS and the 1988 Oil and Gas EA reveals that neither of these documents contains any specific information about the wilderness qualities of the Floy, Flume, and Coal Canyon WIAs proposed for leasing at the November 2003 lease sale, or any site-specific analysis of the impacts to those qualities.

For example, the Moab DNA states that the Oil and Gas EA "addresses impact to overall recreational opportunities," citing an excerpt from the EA which states that the Grand RMP's oil and gas leasing categories "adequately protect the recreation resource values in 22 areas identified in the Grand RMP as having exceptional values."  AR 4914; Moab DNA, Wilderness Characteristics Analysis, at 1 (citing AR 2513; 1988 Oil and Gas EA at unnumbered 5).  This statement is repeated verbatim for each of the nine WIA proposed lease parcels.  AR 4909-14; Moab DNA, Wilderness Characteristics Analysis, 1-4.

The Grand RMP/EIS, however, addressed only recreation values as they existed in 1985 – the date that document was finalized – and not the specific wilderness characteristics (including outstanding opportunities for primitive and unconfined recreation) identified in the Wilderness Inventory.  In other words, because BLM's 1998 wilderness inventory determined that the Floy, Flume, and Coal Canyon WIAs contain remarkable wilderness character,

something that the 1985 Grand RMP/EIS and the 1988 Oil and Gas EA failed to acknowledge, but that the Utah BLM later found to exist, BLM cannot reasonably rely on its outdated planning documents to argue that these values were previously identified or that the impacts of oil and gas development on them were previously evaluated.

In addition, for each of the nine WIA parcels, the Moab field office DNA incorrectly states that the 1988 Oil and Gas EA "specifically addresses the effects of leasing on wildlife, recreation, visual resources, vegetation, soil and water quality," and suggests that this analysis was sufficient to support leasing.  AR 4914, Moab DNA, Wilderness Characteristics Analysis, at 1.  To the contrary, the 1988 Oil and Gas EA and 1985 Grand RMP/EIS contain only the broadest discussion of the effects of leasing over 1.8 million acres of public lands, and these documents certainly do not contain any site specific analysis as to the resources found on each of these nine parcels or the impacts on them that will result from leasing and development. Moreover, because the Wilderness Inventory contains detailed new information about many of these very same resources, including recreation, visual resources, and wildlife, it represents the best and most current information that must be considered.

In its Protest Decision, the Utah BLM echoed the conclusions in the Moab DNA that alleged that the general discussion in the 1985 Grand RMP/EIS and in the 1988 Oil and Gas EA, though broad and not containing any of the site-specific information contained in BLM's Wilderness Inventory and comprehensive case files, sufficiently addressed the impacts of oil and gas leasing and development "on those values comprising the wilderness characteristics of Floy, Coal, and Flume Canyons.  AR 4707; Protest Decision at 6 (citing AR 4874-76, unnumbered

Moab DNA at 1-3).  Thus, though the BLM admits that its earlier NEPA analyses and land use

plans do not include the detailed information found in its own Wilderness Inventory about the

Floy, Flume, and Coal Canyon WIAs, the agency attempts to explain away the significance of

this new information by arguing that its earlier documents *generally* dealt with the issue.  *Id.*

The court finds that the Utah BLM arbitrarily ignored new information (information

produced by the agency itself) in an effort to approve oil and gas leasing and ultimately

development of these lands.  BLM cannot know what the environment effects of leasing and

development will be to the specific wilderness values, in these specific places, if it declines to

undertake the necessary supplemental analysis to evaluate whether its current leasing categories

adequately protect these newly identified resources.  *Marsh*, 490 U.S. at 371 (NEPA's "manifest

concern [is] with preventing uninformed action").  In short, BLM's decision to proceed with

leasing parcels UT 029, UT 030, UT 031, UT 034, UT 036, UT 037, UT 038, UT 039, and UT

053 without supplementing its existing NEPA analysis, and thus without adequate NEPA

analyses to rely upon, was arbitrary, capricious, and contrary to law, and it must be set aside.

### b.  Vernal field office – Desolation Canyon WIA

Because the Utah BLM had already concluded in 1998 that the Desolation Canyon WIA

contains wilderness characteristics that had not previously been identified in either the Book

Cliffs or Diamond Mountain RMPs or any other land use plan or NEPA analysis, the Vernal

field office DNA admits that the "*recent change in the sensitivity (i.e. condition) of those*

*characteristics may have raised new heightened concerns for this area.  These heightened*

*concerns should be afforded a new review and assessment of options in the planning arena and*

*reassessed/reanalyzed in a [sic] updated NEPA document.*" AR 4776; Vernal DNA at 34

(emphasis added).  *See id.* ("There is new information that outlines/provides an opportunity for

a change in resource values/perception of values (i.e. change of condition) that may warrant a re-

assessment.").[11]  The Utah BLM's Protest Decision, however, appears to minimize the

importance of this significant admission by stating that "the quoted language merely suggests

that these values be considered in the 'planning arena,'" and thus, BLM contends, leasing based

on existing analyses was appropriate.  AR 4706; Protest Decision, at 5.

The candid statement in the Vernal DNA supports the conclusion that the BLM

improperly decided to proceed with leasing the three parcels, while recognizing that there is new

information that may change the leasing categories or other land use allocations for these

stunning public lands.  As SUWA argues, NEPA does not sanction this approach of "lease now,

think later."  To the contrary, NEPA required that BLM postpone leasing in areas where the

agency had significant new information about wilderness values that had not been adequately

accounted for.[12]

---

[11]     *See also* AR 3821-23; November Lease Sale Screening (Aug. 7, 2003) (Vernal BLM
wilderness reviewer stated that leasing of parcels UT 026, UT 027, and UT 028 should be
deferred "until an EA can be completed analyzing the wilderness values for Nutters Hole
[located in the Desolation Canyon WIA];" this statement was later changed to reflect the
language found at AR 4776).

[12]     The BLM also argues that because it places no surface occupancy on some–but not all–
of the three Desolation Canyon parcels, it was not required to supplement its NEPA analyses
prior to leasing.  AR 4706; Protest Decision at 5.  It contends that these stipulations and thus its
existing land use plans and NEPA documents "analyzed the effects of oil and gas leasing on
those values comprising the wilderness characteristics of Desolation Canyon and took
appropriate measures to protect those values."  *Id.*  To the contrary, BLM's Desolation Canyon
WIA encompasses both the river corridor comprising Desolation Canyon itself, as well as the
public lands for several miles on either side.  *See* AR 0030; Wilderness Inventory at 127 (the

Moreover, BLM cannot reasonably claim that it has ever taken a hard look at the impact that oil and gas development would have on the wilderness characteristics of the Desolation Canyon WIA.  The 1998 Desolation Canyon wilderness inventory case file post-dates the 1984 Book Cliffs RMP/EIS and the 1991 Diamond Mountain RMP/EIS by fourteen and seven years, respectively.  At the time BLM prepared these NEPA analyses and land use plans, the agency did not know or acknowledge that the area contained wilderness quality lands.  Hence, these documents did not contain the type of site-specific information about the wilderness characteristics of the Desolation Canyon WIA that was provided in the BLM's own 1998 wilderness inventory evaluation, nor could either document analyze the impacts of energy development on those specific characteristics.

In sum, the BLM's wilderness inventory evaluation constitutes precisely the type of significant new information that required additional environmental analysis before BLM approved the November 2003 lease sale.  BLM's decision to lease these parcels without conducting a supplemental NEPA analysis was arbitrary and capricious and must be set aside.

### c.  Richfield field office – Flat Tops proposed wilderness area

The BLM's Richfield field office arbitrarily determined that it was appropriate to lease the following four parcels, all of which are located in the Flat Tops citizen's proposed wilderness

---

Desolation Canyon WIA "terrain varies dramatically, from river bottoms and flood plains at about 4,200 feet elevation to the high ridges of the Tavaputs Plateau at 9,500 feet.").  BLM's attempt to narrow the breadth and scope of the wilderness values found in the Desolation Canyon WIA – an area that "in combination with the Desolation Canyon WSA . . . represent[s] one of the largest blocks of roadless BLM public lands within the continental United States" – to cover only the Canyon itself fails.

area: UT 008, UT 009, UT 011, and UT 012.  AR 4708-10; Protest Decision at 7-9.  In 2002,

SUWA provided new and significant information to BLM regarding the wilderness

characteristics of the Flat Tops proposed wilderness area.  AR 4959; Richfield DNA, at 6.  *See*

AR 3244-3279; Southern Utah Wilderness Alliance Supplemental and New Information Re:

Utah Wilderness Coalition's Flat Tops Proposed Wilderness Unit.  Later in 2002, BLM reviewed

SUWA's submission and determined that it was significant new information:

> Because SUWA proposes a completely different unit boundary than the BLM
> considered in their previous inventory of the Dirty Devil Unit, and which is well
> in excess of 5,000 acres in size; excludes impacts the BLM found to disqualify
> the area in their previous inventory; provides additional information on
> opportunities for solitude and primitive recreation; and provides additional
> information on supplemental wilderness values, *the BLM concludes that the
> information SUWA provides is new and significantly different from that
> considered in the BLM's previous inventory.*

AR 4988-4993; Evaluation of New Information Suggesting that an Area of Public Lands Has

Wilderness Characteristics (emphasis added).  Based on SUWA's significant new information

and BLM's assessment of that information, the agency determined that there is a "reasonable

probability" that the proposed Flat Tops unit has or "may have" wilderness characteristics.  AR

4991.

    The BLM's Protest Decision, however, concluded that, despite the Richfield field

office's earlier admission that SUWA's information was "*new and significantly different from

that considered in the BLM's previous inventory*," an earlier NEPA analysis – the 1975 Price

EAR adequately addressed the wilderness characteristics identified by SUWA.  AR 4959;

Richfield field office DNA, at 6.  BLM's Protest Decision cites a single page of this document to

argue that "[t]he EA cites the impacts to open space and room-to-roam on page 59.  The

information provided is relevant to the actual activities occurring on the ground.  While the

impacts to primitive recreation were addressed broadly, they were addressed sufficiently for the

purposes of leasing."  AR 4710; Protest Decision, at 9.  The full sentence in the Price EAR relied

upon by BLM reads as follows:  "The proposed action [authorizing oil and gas leasing across

millions of acres] could produce marked changes in the open-space and room-to-roam mood of

parts of the district."  AR 2741; Price EAR, at 59 (emphasis added).  This sentence does not

support the BLM's decision to sell these four leases without first conducting a supplemental

NEPA analysis.  AR 5000; References to the 1975 Price District Oil and Gas EA, Richfield field

office.[13]

Overall, the BLM's attempt to interpret the Price EAR's broad statements to support it

conclusion that SUWA's significant new information did not trigger the need for a supplemental

NEPA analysis is unpersuasive.   Setting aside the fact that the Price EAR is:  (1) now thirty

years old, (2) relied upon MFPs prepared in the late 1960's and early 1970's, and (3) was

prepared prior to the enactment of FLPMA and thus without that statute's multiple-use mandate

to guide it, the EAR purported to address the impacts of oil and gas leasing and development on

over 3.1 million acres of public lands in south-central Utah.

_____

[13]     This table did not accompany BLM's Richfield field office DNA that approved leasing,
but was prepared specifically for BLM's Protest Decision.  *Compare* AR 0652-694; September
25, 2005 Richfield field office DNA *with* AR 4951-5020; BLM Protest Decision (including
Richfield field office DNA and undated "References to the 1975 Price District Oil and Gas EA,
Richfield field office").

This document simply does not – indeed, it could not – contain the type of site-specific information provided in SUWA's Flat Tops submission.  AR 2683; Price EAR, at 1.  NEPA does not require that a federal agency supplement its NEPA analyses "every time new information comes to light," but rather only "if the new information is sufficient to show [the proposed action] will affect the quality of the human environment in a significant manner or to a significant extent not already considered."  *Marsh*, 490 U.S. 373-74 (internal citations omitted). In this case, BLM's interpretation of the Price EAR and its resulting refusal to postpone leasing until the agency conducted a supplemental NEPA analysis was arbitrary and capricious. Accordingly, the BLM's decision to lease these four parcels must be set aside as a violation of NEPA.

Regarding all sixteen parcels, the BLM's NEPA documentation simply did not permit the BLM to take the NEPA-required hard look at the potential environmental impacts of the proposed action.

**B.    NATIONAL HISTORIC PRESERVATION ACT**

In light of the court's conclusion regarding the Utah BLM's NEPA violations, it is unnecessary for the court to reach SUWA's claim that the Utah BLM also violated the NHPA.

**V.  CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED that the Utah BLM's decision denying SUWA's protest–and its decision to lease the 16 parcels at issue here–is REVERSED and REMANDED for further consideration consistent with the court's decision that the Utah

BLM violated NEPA by issuing four leases in the area administered by the Richfield field office without taking a hard look at the no-leasing alternative and by failing to consider significant new information about wilderness values and characteristics of all sixteen parcels.  This case is now closed.

DATED this 1st day of August, 2006.

BY THE COURT:

_____

DALE A. KIMBALL

United States District Judge